IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 23, 2014

**STATE OF TENNESSEE v. RANDY RAY RAMSEY**

**Appeal from the Circuit Court for Cocke County**
**No. 2362     Ben W. Hooper, II, Judge**

---

**No. E2013-01951-CCA-R3-CD-FILED-OCTOBER 29, 2014**

---

A Cocke County Jury convicted Defendant, Randy Ray Ramsey, of second-degree murder. He received a sentence of twenty-five years to be served concurrently with a federal sentence for drug-related convictions. On appeal, Defendant argues that the evidence was insufficient to support his conviction for second degree murder and that the trial court improperly sentenced him. After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Jessica S. Sisk, Newport, Tennessee, for the Appellant, Randy Ray Ramsey.

Herbert H. Slatery, III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall Eugene Nichols, District Attorney General; Joann Sheldon and Tonya Thornton, Assistant District Attorneys General, for the appellee, the State of Tennessee.

**OPINION**

On June 17, 2010, Officer Jason Oury of the Cocke County Sheriff's Department was dispatched to a shooting at the Park Entrance Grocery located at 330 Highway 32 South. He arrived on the scene at approximately 2:20 a.m. and pulled up to the front of the store. He was then waved to a lower parking lot by Johnny Grooms. Officer Oury pulled to the rear of the store and then entered an apartment located on the back side of the store. He saw Defendant, who appeared distraught, kneeling on the floor beside the victim, Molly Green-Howard, holding some bloody towels. Defendant immediately said, "I dropped it, it went off."

Officer Oury testified that Defendant was cooperative but very emotional. Officer Oury was on the scene for approximately two hours and eventually transported Defendant to the Criminal Investigation Division to speak with investigators.

Detective Robert Caldwell later spoke with Defendant and obtained a written statement from Defendant which contained the following:

> I moved in my room at the bottom of the Park Entrance Grocery sometime mid January of 2010. I met [the victim] in January of 2010. [The victim] moved in with me about a month ago, about one month ago. Last night, Wednesday June 16th, 2010, [the victim] and [I] went to Buddy's Bar. We stayed at the bar several hours. [The victim] and I drank some beer. I think we got home about midnight. When we got home [the victim] said she was going to take a shower. I had a 12 gauge shotgun in the room near the refrigerator. I had the gun to shoot water snakes. [The victim] asked me to take the gun to the building outside. I picked the gun up that was leaning against the wall. When I picked the gun up it went off. I did not know the hammer was cocked. I had the gun raised up when it went off. [The victim] was shot and fell to the floor. I did not intend to shoot [the victim]. The gun just went off. I know that I did not pull the trigger. I called 911 to get help," signed [Defendant].

After the statement was written and signed, Defendant wanted the following added to the statement:

> [The victim] wanted me to move the gun outside because she did not like guns. I always moved the gun out to the building before we went to bed. I do not know when the gun was cocked. I last shot the gun Tuesday June 15, 2010 when I killed a water snake. I think we had been home from Buddy's Bar about an hour when this incident occurred."

Detective Caldwell then asked Defendant to use a baseball bat to demonstrate how he was holding the weapon at the time of the shooting. The demonstration was photographed, and the photograph was made an exhibit at trial.

Special Agent Derek Newport of the Tennessee Bureau of Investigation (TBI) received a call from Detective Robert Caldwell during the early morning hours of June 17, 2010, concerning the shooting. Special Agent Newport arrived on the scene at approximately 3:33 a.m. and began processing the apartment. He diagramed and photographed the scene and collected a twelve gauge shotgun. Special Agent Newport testified that when he found the gun "the breech was closed, laying on the floor, hammer's forward." He also said that

there was a fired cartridge casing "inside the breech, not the shotgun." Special Agent Newport further explained:

> Once it's photographed and measured, single shot shotguns, as some of you know, have a lever to break the weapon down. Break the weapon down and open the breech and the ejector did not eject the casing, it was still - - the fired cartridge casing was still in there with the pressed primer and had to pull it out with my fingernails to get it to slide out.

Special Agent Adam Gray, a forensic scientist supervisor for the toxicology section of the TBI crime lab, testified that tests of the victim's blood and vitreous fluid did not reveal the presence of alcohol. Special Agent Gray testified that the victim's toxicology report indicated the presence of Atropine, a drug usually given by medical personnel or EMTs to help the heart, Diazepam less than 0.05 UG/ML, Nordiazepam (a breakdown of Diazepam) less than 0.05 UG/ML, and Oxycodone at 0.05 UG/ML. In the report, Special Agent Gray also noted that presumptive testing indicated the possibility of additional benzodiazepines. Another drug, methlypenidate (Ritalin) at less than 0.05 UG/ML was also identified. Special Agent Gray noted that all of the drugs present in the victim's system were within or below the therapeutic range.

In 2010, Special Agent Robert Royse was working as the scientist supervisor over the Firearm and Tool Mark Identification Unit of the TBI Nashville Crime Lab. He testified that the firearm recovered from the crime scene was a "Lyon Arms 12 gauge top break shotgun." Special Agent Royse noted that the shotgun was very old, and the only safety mechanism on the weapon was a trigger guard. Concerning testing on the shotgun, Special Agent Royse testified:

> . . . I performed function tests using a primed shot shell case and what I did was I closed the action, cocked the hammer back, and then what I do is two things. I determine if the hammer can push off, do that by pushing against the hammer here to see it's got a rounded sear and then I just see if it will jar off, and the way that I see it will jar off is by dropping - - dropping it from approximately 18 inches onto the floor on the butt on the muzzle. [sic]. I then take a raw hide mallet and I strike it from each side top and bottom to see if it will dislodge the hammer and cause it to fall forward.

Special Agent Royse noted that during the tests, the hammer remained cocked, and the weapon did not discharge. He also determined that the shotgun required approximately tens pounds of pressure on the trigger for the hammer to fall. Special Agent Royse was further able to determine that if the "hammer is lowered into the lower position and the

-3-

hammer spur is struck with an object, a raw hide mallet in my case, it will discharge the shot shell case."

Special Agent Royse examined the shell casing recovered in the present case. He determined that the shell had been fired from the Lyon Arms shotgun. Special Agent Royse examined the bikini top that the victim had been wearing at the time of the shooting which had a hole near the center of the right cup. He performed a "muzzle-to-garment distance determination" and determined that the shot was fired at a distance greater than two feet and less than six feet. On cross-examination, Special Agent Royse verified that the shotgun would not fire when the hammer was cocked if it was banged against something. However, it would fire when the hammer was not cocked if the gun was bumped against something from the rear with a "fairly substantial" hit. Special Agent Royse estimated that the shotgun was manufactured "around the turn of the century, around 1900."

Dr. Steven Cogswell performed an autopsy on the victim. The victim had a gunshot wound to her chest wall just underneath her right breast. She was wearing a black bikini swim suit at the time of the offense. Dr. Cogswell noted that the edge of the wound was "associated with the lower edge of the bikini top at the - - I guess the strap it would be called. That's where the bottom edge of the bikini top was resting at the time the shot was fired."

Dr. Cogswell testified that the shotgun wound was an intermediate range wound. He estimated that the range of fire from the muzzle of the gun to the victim's body was three to five feet. Dr. Cogswell noted that although the gunshot wound was on the lower edge of the victim's right breast, the majority of her internal injuries were down in the abdomen and involved the liver and the aorta and the vena cava which runs along the side of the spine. He said: "So this pathway, even though it's up higher on the chest and it's further out to the right, is actually going downward into the left to impact the more central organs of the abdomen which is below the chest." Concerning the position of the victim's body at the time of the shooting, Dr. Cogswell testified:

> Part of what we do is an attempt to put people in a particular position at the time they were shot. For example, if my arm is in front of my chest and I'm shot through my arm and it enters my chest, I'll be able to reconstruct that and say the arm had to be in this position for me to get that gunshot wound so it has to line up like that. In this particular case, because we're talking about a female breast and we all know that it changes shape depending on whether you're lying down, standing up, leaning forward, it becomes important to see in what position was [the victim] when she was shot. And based on that, as you can see what we're talking about the lower curvature of the breast. If she's sitting upright, then the weight of the breast itself starts to roll over and

the wound no longer is this nice oval shape. It becomes distorted and wrinkled and so that can't be the position that she's in because the wound is going to achieve a regular shape whether round or oval on the skin as it impacts. And so if we move things around to distort that wound or wrinkle the wound, those are not in the position that the - - that this person was in at the time the shot was fired.

\*　　\*　　\*

. . .[T]his is a photograph that I took at the time of the autopsy and we have got [the victim] sitting up on the autopsy table. You can see that both her breasts now take the typical contour of a woman's breast standing upright, that is it's starting to hang down a little bit. But you can see particularly just above the letter "A" and the autopsy number how that contour of the wound wrinkles and lays over itself and how the wound now is no longer this nice oval shape that you saw when she was lying on her back but has now started to actually sort of fold over on top of itself. So that position is not an appropriate position for her to be in at the time the shot is fired because the pellets are all going to make a neat hole on whatever surface they impact. And if she had been upright like this, then the lower edge of that wound would match sort of the lower- - the upper edge of that wound. You can see the upper edge is still sort of oval and relatively regular and smooth. The lower edge, however, is all straight and wrinkled up on itself. If she had been in this position, the lower edge of that wound would have been a nice curve matching the upper edge.

\*　　\*　　\*

If we look at the bathing suit top, you can see that the defect in the cloth is somewhat irregular and that's of course because this is where the bra cup comes together at the band and this upper strap or the band in front is associated with that abrasion just under the wound. So if we simply lay the bikini top over the wound, then we can see in what position it was at the time. Now, of course, being that there's a breast inside this bikini top it's going to be somewhat bulged out and that explains why the wound here or defect here in the cloth is not quite as regular as it is on the skin.

It was Dr. Cogswell's opinion that the victim was lying flat on her back when she was shot. He testified that since the victim's bathing suit top was made from thin material and

did not contain an underwire, it was of minimal relevance to the position of the victim's body at the time of the shooting. Dr. Cogswell testified:

> There's going to be a tiny bit of support, but I think any woman who has worn a bathing suit and any man who had looked at a woman in a bathing suit knows that there's not a whole lot of actual change in the contour of the breast unless it's one of these that's meant to be supportive.

Dr. Cogswell also observed the photograph of Defendant's demonstration of how he was holding the gun at the time of the shooting. He testified that the photograph also demonstrated that the victim was lying down at the time of the shooting.

Dr. Gregory James Davis, an expert in pathology and an Assistant State Medical examiner for the State of Kentucky, testified that he reviewed Dr. Cogswell's autopsy report. He agreed with ninety-nine percent of the report and noted that it was an "excellent report, excellent observations and autopsy." However, he had one disagreement with the findings. Dr. Davis testified:

> It's my opinion as a medical examiner/forensic pathologist that it is not possible to know the position that [the victim] was in at the time that she sustained her wound. Specifically I don't know if she was lying on her back, sitting upright or standing upright at the time of the infliction of the injury and it is my opinion I don't believe a medical examiner can make that opinion.
>
> *       *       *
>
> Well, certainly, you know, I agree with Dr. Cogswell, the wound looks differently as the body of [the victim] lies upon the autopsy table. Where I have difficulty is in the interpretation of then sitting the decedent up, and we use the term "patient" even though the patient is deceased, in sitting the patient up and seeing that the wound become[s] distorted, given the fact that [the victim] was wearing a bikini top at the time of the infliction of the wound, the charge or the pellets from the shotgun went through that bikini top was at the time of the infliction of the wound regardless of arguments about whether [the victim] was small breasted or medium breasted, I mean it's all relative but we all know that a top can potentially lend some support. So I'm not here today to testify, and let me be very clear, that I know what position she was in. It's my position, to a reasonable degree of medical certainty, that one cannot know the position she was in.

Dr. Davis agreed that the autopsy findings were consistent with the victim lying on her back at the time of the shooting. However, he felt that there were other scenarios that could have taken place.

## II. Analysis

### I.     Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence for his second degree murder conviction. He  argues that the State did not prove that he "knowingly" killed the victim. He also argues that the State failed to prove the death was anything but accidental. When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). It is also a "result-of-conduct offense," and "[t]he statute focuses purely on the result and punishes an actor who knowingly causes another's death." *State v. Ducker*, 27 S.W. 3d 889, 896 (Tenn. 2000). Thus, as pertinent here, a person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.* § 39-13-302(b). Furthermore, "[a] person can act knowingly irrespective of his or her desire that the conduct or result will occur." *State v. Gray*, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997); *State v. Rutherford*, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993).

Viewing the evidence in a light most favorable to the State, the proof showed that Defendant shot the victim in the chest with a twelve-gauge shotgun killing her. Although Defendant claimed that the shooting was accidental, the proof at trial showed otherwise. In

his statement to police, Defendant said he picked up the gun that had been leaning against a wall, and "it went off." Defendant claimed that he did not know the hammer was cocked and that he had the gun raised up when it went off. Defendant claimed the victim was shot and then fell to the floor. Defendant said that he did not pull the trigger, and he did not know when the gun was cocked.

However, Special Agent Royse performed function tests on the shotgun. He noted that during the tests, the hammer remained cocked, and the weapon did not discharge. He also determined that the shotgun required approximately tens pounds of pressure on the trigger for the hammer to fall. Special Agent Royse was further able to determine that if the "hammer is lowered into the lower position and the hammer spur is struck with an object, a raw hide mallet in my case, it will discharge the shot shell case." On cross-examination, Special Agent Royse verified that the shotgun would not fire when the hammer was cocked if it was banged against something. However, it would fire when the hammer was not cocked if the hammer was struck by something from the rear with a "fairly substantial" hit.

Special Agent Royse also performed a "muzzle-to-garment distance determination" on the victim's bikini top and determined that the shot was fired at a distance greater than two feet and less than six feet.

Dr. Cogswell testified that based on location of the victim's wound, the path of the bullet, and the range of fire that the victim was lying flat on her back when she was shot. He further indicated that based on the contour of the victim's breast in the bikini top, it was not possible for the victim to have been standing when she was shot. This belies Defendant's statement to police that he raised the gun and that it accidently discharged striking the victim who then fell to the floor.

Defendant claimed the shotgun was cocked and accidently discharged when he picked it up without touching the trigger. The physical evidence presented by the State contradicts this scenario.

Defendant held a baseball bat to demonstrate how the shotgun was pointed downward while he held it with both hands when the fatal shot was fired. This was consistent with the conclusion of the State's expert witness that the victim had to be lying down on her back when she was shot. From the circumstantial and direct evidence the jury could reasonably infer that Defendant knowingly shot the defenseless victim when she was lying on her back and the muzzle of the shotgun was no more than four to five feet away. The direction of travel of the shotgun pellets after entering just below the victim's right breast was from the victim's right to her left, front to back with a downward trajectory.

-8-

As was their right, the jury convicted Defendant of second degree murder obviously rejecting Defendant's claim that the gun accidently discharged when he picked it up. Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's conviction for second degree murder. Defendant is not entitled to relief on this issue.

*II. Sentencing*

Next, Defendant argues that the trial court erred in affording substantial weight to one enhancement factor and affording no weight to two mitigating factors. First, we note that pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn.Code Ann. § 40-35-114, -210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id.* § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id.* § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected,* 271 S.W.3d 90 (Tenn. 2008)).

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 709 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court

imposes a sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

We note that even a trial court's misapplication of an enhancing or mitigating factor in passing sentence will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. Here, Defendant asserts that the trial court was in error by imposing a sentence of twenty-five years based on one enhancement factor and two mitigating factors.

However, we conclude that the sentencing decision was "within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10. Defendant was convicted of second degree murder, a Class A felony, and faced a sentence of fifteen to twenty-five years as a Range One offender. Tenn. Code Ann. § § 39-13-210(c); 40-35-112 (a)(1). Defendant is not entitled to relief.

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE

-10-